**KAZEROUNI LAW GROUP, APC**
Ryan L. McBride, Esq. (SBN: 297557)
ryan@kazlg.com
Nadir O. Ahmed (SBN: 290810)
nadir@kazlg.com
2221 Camino Del Rio S., #101
San Diego, CA 92108
Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

**MADAR LAW CORPORATION**
Alex S. Madar, Esq. (SBN: 319745)
alex@madarlaw.net
11510 Eaglesview Ct.
San Diego, CA 92127
Telephone: (858) 299-5879
Facsimile: (619) 354-7281

*Attorneys for Plaintiff,*
Kyle Miholich

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYLE MIHOLICH, individually and on behalf of all others similarly situated, | Case No.: __'24CV1038 AGS JLB__ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| THE REAL BROKERAGE, INC., REAL BROKER LLC, REAL BROKERAGE TECHNOLOGIES, INC., REAL BROKERAGE TECHNOLOGIES LFRO, INC., | **VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C §§ 227, *ET SEQ.*** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff KYLE MIHOLICH ("Plaintiff"), individually and on behalf of the proposed Class defined below, brings the following class action complaint against The Real Brokerage Inc., Real Broker LLC, Real Brokerage Technologies, Inc., Real Brokerage Technologies LFRO, Inc., and DOES 1-100 (collectively "Defendants"). Plaintiff alleges as follows:

## **INTRODUCTION**

1.    Defendants operate one of the leading cloud-based real-estate brokerages in North America, and have a presence in all 50 states as well as in Canada.

2.    Defendants contract with tens of thousands of real estate agents across the country (collectively, the "Agents" or "Real Broker Agents"), who drive business for Defendants by identifying leads and turning those leads into home sales under the Real Broker brand name.

3.    One way the Real Broker Agents drive home sales for Defendants is to "cold call" or "cold text" residential and cellular telephone numbers directly to market their real estate services and the Real Broker brand to the call and/or text recipients.

4.    Defendants not only authorize and ratify the Agents' practice of cold calling or cold texting residential and cellular telephone numbers directly to market Defendant' real estate services, they also welcome the financial benefits of the increased home sales that the cold calls and texts generate.

5.    In their zeal to find clients and get more commissions, the Defendants have failed to take sufficient precautions to ensure their Agents do not engage in harassing telephone practices.

6.    In particular, Defendants have failed to adopt sufficient procedures to ensure their Agents do not call potential customers who are not on the National Do

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Not Call Registry ("NDNCR").   This practice violates the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"), and its implementing regulations.

7.     To increase their revenues, Defendants encourage and permit their Agents to partner with various autodialing and auto-texting companies and platforms, which in turn provide the Agents with the capacity to harass a larger number of people with unwanted calls and texts.

8.     Defendants have thus far evaded accountability for their egregious violations of the TCPA by utilizing a complicated corporate structure, by which they abuse the corporate form through a network of shell companies, wholly owned subsidiaries, purported franchises, and other entities.

9.     The Real Broker Agents make these cold calls and texts on behalf of and as agents of Defendants for reasons including but not limited to the following:

      a.     Defendants profit from every home sale made by each Real Agent and have a financial interest in ensuring the Agents can market themselves widely and quickly.

      b.     It is Defendants – not their shells or subsidiaries or Agents – that design the Real Broker Agents' cold calling/texting policies and oversee Agent training, and they have either neglected to design, or designed and weakly implemented an insufficient process for "compliance" with the TCPA, which they know the Agents fail to follow.  In the event a TCPA compliance process was put in place, Defendants have authorized and ratified the Agents' failure to follow the TCPA "compliance" process they designed.

      c.     Defendants know of, approve, and ratify the Agents' conduct in connection with making the cold calls and texts at issue, including the following: (1) the Agents' use of Defendants' intellectual property, such as the "Real Brokerage", "Real Broker", or "Real" brand names; and (2) the Agents' use of texting and cold-calling

platforms to make the calls and texts.

d.     Defendants utilize subsidiaries that are undercapitalized and are shell companies.

10.     Plaintiff and thousands of people nationwide are victims of Defendants' reckless cold calling and texting practices.    They received numerous unwanted marketing calls and texts that were for the purpose of advertising the Defendants' Real Broker real estate business.    These calls and texts were placed without regard to anyone's status on the NDNCR and without regard to prior complaints made to any Defendant.

11.     Because Defendants engage in and profit from pervasive cold calling and texting that results in violations of the TCPA, Plaintiff brings this class action complaint for damages, restitution, injunctive relief, and any other available legal or equitable remedies, resulting from Defendants' unlawful calls to their residential and mobile telephone lines, in violation of the TCPA.

**JURISDICTION AND VENUE**

12.     This Court has federal question subject matter jurisdiction over this class action lawsuit pursuant to 28 U.S.C. § 1331 as Plaintiff alleges violations of a federal statute, the TCPA.

13.     The Court has personal jurisdiction over Defendants because Defendants conduct significant business in this District, and the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or emanated from this District.

14.     This Court has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) because Plaintiff and the members of the Class have suffered aggregate damages exceeding $5,000,000, exclusive of interests and costs, and this case is a class action in which a member of the Classes is a citizen of a state different from Defendants.

15.     Venue is proper in the United States District Court for the Southern

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

District of California pursuant to 18 U.S.C. § 1391(b) because Defendants are subject to personal jurisdiction in the County of San Diego, State of California as not only do Defendants regularly conduct business throughout the State of California, but Plaintiff resides within the State of California, County of San Diego.

## PARTIES

16.  Plaintiff is, and at all times mentioned herein was, a citizen and resident of the State of California, County of San Diego. Plaintiff is, and at all times mentioned herein was, a "person," as defined by 47 U.S.C. § 153(39).

### Defendant The Real Brokerage Inc.

17.  Defendant The Real Brokerage Inc. ("Real Broker Parent") claims to be "North America's fastest-growing, publicly traded brokerage."[1]

18.  Real Broker Parent has its principal place of business and headquarters is located at 27 West 24th Street, Suite 407, New York, NY 10010. Defendant Real Broker Parent is, and at all times mentioned herein was a "person," as defined by 47 U.S.C. § 153(39).

19.  Plaintiff alleges that at all times relevant herein Defendant Real Broker Parent conducted business in the State of California and in the County of San Diego, and within this judicial district.

20.  The Real Broker Parent owns and controls a variety of subsidiaries, franchises, shell companies, and other entities, all of which are alter-egos of the Real Broker Parent, and include the below-listed Defendants:

### Other Real Broker Defendants

21.  Defendant Real Broker LLC is a Delaware limited liability company with a California principal place of business listed as 39899 Balentine Dr., Suite 200, Newark CA 94560.

22.  Defendant Real Brokerage Technologies Inc. is a California corporation

---

[1] https://www.onereal.com (last accessed April 25, 2024)

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

with its principal place of business listed as 39899 Balentine Dr., Suite 200, Newark CA 94560, and office address listed at 1420 Kettner Blvd. #100, San Diego, CA 92101.

23.    Defendant Real Brokerage Technologies LFRO Inc. is a Delaware corporation with a California principal place of business listed as 39899 Balentine Dr., Suite 200, Newark CA 94560.

24.    The Real Broker Defendants also do business under similarly named shell companies, including, but not limited to: Real Broker Commercial, LLC; Real Broker Alaska, LLC; Real Broker AZ, LLC; Real Broker CT, LLC; Real Broker MA, LLC; Real Broker NH, LLC; Real Broker NE, LLC; and Real Broker NY, LLC.

25.    The legitimate business purposes of Defendants Real Broker LLC, Real Brokerage Technologies Inc., Real Brokerage Technologies LFRO Inc., and all other similarly named entities listed in paragraph 24 are unknown, and the companies appear to operate as shell companies and alter-egos of Real Broker Parent.

## FACTUAL BACKGROUND

### A. Overview of the TCPA.

26.    In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In doing so, Congress recognized that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy.…"  Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(5) (1991) (codified at 47 U.S.C. § 227).

27.    The TCPA was designed to prevent calls and messages like the one described within this complaint, and to protect the privacy of citizens like Plaintiff. "Voluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

28.    Specifically, the TCPA restricts telephone solicitations (*i.e.,*

telemarketing) and the use of automated telephone equipment, as well as violations of the TCPA's National Do-Not-Call provision of 47 C.F.R. § 64.1200(c).[2]  The TCPA limits the use of automatic dialing systems, artificial or prerecorded voice messages, SMS text messages, and fax machines.   It also specifies several technical requirements for fax machines, autodialers, and voice messaging systems–principally with provisions requiring identification and contact information of the entity using the device to be contained in the message.

29.    In 2003, the FCC promulgated regulations  that created the National Do Not Call Registry. *See* 47 C.F.R. § 64.1200(c)(2). The NDNCR is a list containing the residential and cellular telephone numbers of individuals who affirmatively indicate they do not wish to receive unsolicited calls from commercial telemarketers. Do not call registrations must be honored indefinitely. *Id.*

30.    In addition to its broad prohibition on calls to any number listed on the NDNCR, the TCPA prohibits *any* telemarketing call "unless such [entity] has  instituted procedures for maintaining a list of persons who request not to receive telemarketing calls by or on  behalf  of  that  [company]." §64.1200(d). The "minimum standards" for  these  procedures  include  training  of  personnel  engaged  in  marketing  on  the existence and use of an internal do-not-call list, placing an individual's phone number on that internal do-not-call list, and honoring that request within no more than 30 days of its receipt. *Id.*   An entity  violates  the  TCPA  if  it  initiates  a  phone  call  without having  implemented  the  minimum  procedures.

31.    Today, 230 million telephone numbers are on the National Do Not Call Registry.[3]

---

2     According      to      the      Federal      Communications      Commission's      website, https://www.fcc.gov/consumers/guides/wireless-phones-and-national-do-not-call-list,  accessed  on June 3, 2021: Placing telemarketing calls to wireless phones is - and always has been - illegal in most cases.

3     Simon van Zuylen-Wood, *How Robo-callers Outwitted the Government and Completely Wrecked the Do Not Call  List,*     WASH     POST     (MAGAZINE),     Jan.     11,     2018,     *available     at* https://www.washingtonpost.com/lifestyle/magazine/how-robo-call-moguls-outwitted-the-government-and-completely-

32.    Despite the widespread embrace of the NDNCR, companies like Defendants flagrantly ignore the Registry and invade the privacy of consumers with unwanted calls

33.    In enacting the TCPA, Congress intended to give consumers a choice as to how creditors and telemarketers may call them and made specific findings that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer."    TCPA, Pub.L. No. 102-243, § 11. Toward this end, Congress found that:

> Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

*Id*. at § 12; *see also, Martin v. Leading Edge Recovery Solutions, LLC*, 2012 WL 3292838, at *4 (N.D. Ill. Aug. 10, 2012) (citing Congressional finding on TCPA's purpose).

34.    Congress also specifically found that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call […]."  *Id*. At §§ 12-13; *see also, Mims*, 132 S. Ct. at 744.

35.    As Judge Easterbrook of the Seventh Circuit explained in a TCPA case regarding calls to a non-debtor similar to this one:

> The Telephone Consumer Protection Act […] is well known for its provisions limiting junk-fax transmissions. A less litigated part of the Act curtails the use of automated dialers and prerecorded messages to cell phones, whose

---

wrecked-the-do-not-call-list/2018/01/09/52c769b6-df7a-11e7-bbd0-9dfb2e37492a_story.html   (last  accessed  June  10, 2024).

> subscribers often are billed by the minute as soon as the call is answered – and routing a call to voicemail counts as answering the call.  An automated call to a landline phone can be an annoyance; an automated call to a cell phone adds expense to annoyance.

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638 (7th Cir. 2012).

36.   Text messages are calls and are subject to the TCPA.  *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666 (2016); *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 954 (9th Cir. 2009).

37.   47 C.F.R. § 64.1200(a)(2) additionally states, with respect to advertisement and telemarketing calls—of which Defendant's texts to Plaintiff are—that "[n]o person or entity may . . . [i]nitiate or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party …"

38.   47 C.F.R. § 64.1200(f)(8) defines "prior express written consent" as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered."

39.   As of October 16, 2013, unless the recipient has given *prior express written consent*,[4] the TCPA and Federal Communications Commission ("FCC") rules under the TCPA generally:

---

[4] Prior express written consent means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

- Prohibit solicitors from calling residences before 8 a.m. or after 9 p.m., local time.

- Require that solicitors provide their name, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which that person or entity may be contacted.

- Prohibit solicitations to residences that use an artificial voice or a recording.

- Prohibit any call or text made using automated telephone equipment or an artificial or prerecorded voice to a wireless device or cellular telephone.

- Prohibit any call made using automated telephone equipment or an artificial or prerecorded voice to an emergency line (*e.g.*, "911"), a hospital emergency number, a physician's office, a hospital/health care facility/elderly room, a cellular telephone, or any service for which the recipient is charged for the call.

- Prohibit autodialed calls that engage two or more lines of a multi-line business.

- Prohibit unsolicited advertising faxes.

- Prohibit certain calls to members of the National Do-Not Call Registry.

40.    Furthermore, in 2008, the FCC held that "a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act, Declaratory Ruling on Motion by ACA International for Reconsideration*, 23 FCC Rcd. 559, 565,

---

artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8).

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

¶ 10 (Jan. 4, 2008); *Birchmeier v. Caribbean Cruise Line, Inc.*, 2012 WL 7062748 (N.D. Ill., Dec. 31, 2012).

41.    The TCPA also provides that liability should be imposed when calls are made on behalf of an entity or person. 47 U.S.C. § 227(c)(5). In its implementing regulations and interpretations, the FCC has determined that this statutory mandate is broad, and that vicarious liability applies where there is apparent authority, actual authority, ratification, or, under the express terms of § 227(c), when unlawful calls are placed "on behalf of" the seller. *In re Joint Pet. Filed by Dish Network*, 28 FCC Rcd. 6574 (2013).

42.    Accordingly, the entity can be liable under the TCPA for a call made on its behalf, even if the entity did not directly place the call.    Under those circumstances, the entity is deemed to have initiated the call through the person or entity.

43.    With respect to misdialed or wrong-number calls, the FCC recently clarified that "callers who make calls without knowledge of reassignment and with a reasonable basis to believe that they have valid consent to make the call should be able to initiate one call after reassignment as an additional opportunity to gain actual or constructive knowledge of the reassignment and cease future calls to the new subscriber." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, FCC 15–72, 30 F.C.C.R. 7961, ¶¶ 71-72 (July 10, 2015).  "If this one additional call does not yield actual knowledge of reassignment, we deem the caller to have constructive knowledge of such." *Id.*  Thus, any second call placed to a wrong number violates the TCPA.

44.    The TCPA provides for damages in the amount of $500 for each negligent violation and $1,500 for each knowing violation. *See* 47 U.S.C. § 227(b)(3).

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**B. Defendants Have Executed a Nationwide Cold Calling Scheme That Has Unlawfully Harassed People Around the Country.**

**i. Defendants Operate a Large Real Estate Conglomerate That Directs and Supervises Agents to Sell Real Estate Under Their Real Broker Brand on Their Behalf.**

45.    Defendants are one of North America's largest cloud-based real estate conglomerates.

46.    As of May 29, 2024, Defendants represent that over 18,000 agents operate under the Real Broker umbrella.[5]

47.    Each Real Broker Agent affiliates with one or more of the Real Broker Defendants and holds themself out as a real estate agent under the Real Broker brand. The Defendants allow each of the Real Broker Agents to have a designated webpage that lists the Agent's contact information, short biography, and the homes for which they represent Real Broker.  People interested in buying and selling homes in a specific geographic area can find a Real Broker Agent by searching the Real Broker website to help them do so. When a home is sold, the payment is purportedly received by one of the shell companies that is an alter-ego of and controlled by Defendants; that shell company then pays the Agent a commission while Defendants also receive a portion of the profit.

48.    To become a Real Broker Agent and be able to help people buy and sell homes through the Real Broker brand, a person must first apply and be accepted for such a role by the Defendants, including one or more of their alter-egos. In other words, individuals cannot just simply decide to hold themselves out as being a Real Broker representative; instead, every Real Broker Agent has received an affirmative authorization from Defendants, including one or more of their alter-egos, to hold themselves out as such.

---

[5] https://blog.onereal.com (last accessed May 29th, 2024).

49.    Because homeowners typically only contract with one real estate brokerage to assist them in selling their homes, and competition in the real estate market is fierce, Defendants have an incentive to obtain as many home listings as possible to increase their profits.

50.    Moreover, if a real estate brokerage has a large share of the listings for homes for sale in a given geographic market at a given time, it can use its market power to raise the prices on the homes it has for sale, since fewer competing listings can undercut the real estate brokerage with lower home prices. Due to Defendants' large number of affiliated agents, they are able to capture large shares of the market in given regions, and they have tremendous incentive to obtain more and more home listings to be able to keep real estate prices high.

51.    The Real Broker Agents do not operate independently. Rather, each one is run in accordance with the Defendants' policies and procedures to ensure continuity in customer service, and to protect the reputation of the Real Broker brand, which, in turn, ensures more profits for Defendants.

## ii.    Defendants Know That the Real Broker Agents Engage in Cold Calling to Sell Real Estate on Their Behalf.

52.    Defendants know that it is standard practice in the real estate field to use cold calling and telephone solicitation to generate new business, and they know and expect that their Real Broker Agents will employ these strategies when selling real estate on their behalf.

53.    As is typical to the industry and known to Defendants and their alter-egos, Real Broker Agents often scan real estate listings that are from competitors, are for sale by owner ("FSBO"), or are expired to identify individuals who might be in the market for a new real estate agent, and they cold call these homeowners to try to convince them to retain the Agent to list the property.

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

54.     Real Broker Agents also prospect for potential home buyers or sellers by cold calling homeowners or renters in targeted geographic areas, including in the vicinity of existing listings, open houses, or recent sales. Defendants provide training on and gives Real Broker Agents access to various lead generation services which allows Real Broker Agents to download residents' contact information, including phone numbers, to make such geo-targeted cold calls.

55.     Real Broker Agents can also sign up for other services that provide them with leads and contact information. As is common to the industry, Real Broker Agents will mine other sources of information for potential home buyers' or sellers' phone numbers, for example, by forming relationships with third parties who supply the Real Broker Agents with phone numbers.

56.     Real Broker Agents, like others in the industry, also search for prospective homebuyers, often buying lists of prospective customers from real estate aggregator services, such zillow.com or realtor.com.

### iii.   Defendants Know, Ratify, and Authorize Their Agents to Use Autodialing Software to Dial Millions of Numbers.

57.     Because placing individual calls one by one often can be cumbersome and time consuming, those working to drive business in the real estate industry often use autodialer platforms.

58.     Autodialers provide software that permits businesses to: (1) increase the number of people they call in a given time period, and (2) deliver both prerecorded messages and text messages on a widespread basis to large numbers of recipients over the phone.

59.     By using autodialing, callers can reach far more people than they would if they were directly calling or texting.

60.     As a result, the use of autodialers is common in the real estate industry.

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

     **a. Defendants Know, Ratify, and Authorize the Use of Autodialing Software by Real Broker Agents to Increase Their Profits.**

61.    Defendants know, authorize, and ratify the Real Broker Agents' usage of autodialing systems and software.

62.    First, as set forth in Paragraphs 57-60, use of autodialers is common in the sales and real estate industries. Defendants, as leaders in the real estate field, are familiar with sales practices and this trend.

63.    Defendants promote the use of autodialing platforms, and in fact have entered into partnerships with Real Estate Customer Relationship Management ("CRM")'s which provide autodialing features through their platform, including, but not limited to, Lofty CRM.[6]

64.    Additionally, Defendants promote and provide online training programs to the Real Broker Agents, while knowing those training programs both encourage and instruct agents on the use of autodialers. Defendants know its agents attend these workshops, and Defendants suggest that Real Broker Agents attend.

     **iv.    Defendants Routinely Violate the TCPA with Harassing Phone calls to People on the National Do Not Call Registry**

65.    Defendants' business practices violate the TCPA, as they cause people to be called often repeatedly, notwithstanding the fact that their numbers are listed on the National Do Not Call Registry ("NDNCR").

66.    The FCC's regulations at 47 C.F.R. § 64.1200(c)(2) prohibit Defendants from placing calls to numbers on the NDNCR, but Defendants do nothing to ensure that the Real Broker Agents do not place any such calls. Defendants know that their cold-

---

[6] https://support.therealbrokerage.com/hc/en-us/articles/5600210539543-What-is-Lofty (Last accessed on June 10, 2024)

calling practices have caused and will cause unwanted calls to people on the NDNCR but allow the calls to continue to increase their profits.

67.    When Real Broker Agents place calls through an autodialer platform, including but not limited to platforms recommended by and/or partnered with by Defendants, Real Broker Agents call people on the NDNCR in violation of 47 U.S.C. § 64.1200(c)(2). Defendants do not vet lists provided to and used by Real Broker Agents to dial by comparing them to the NDNCR.

68.    Defendants have not taken adequate steps to prevent Real Broker Agents from calling people on the NDNCR.  Defendants have not adopted sufficient written procedures, training programs, or a process that they know will actually prevent Real Broker Agents from calling numbers on the NDNCR.

69.    Defendants' written procedures are inadequate and do not comply with 47 U.S.C. § 64.1200(c)(2)(i)(A).

70.    Defendants' training is inadequate and does not comply with 47 U.S.C. § 64.1200(c)(2)(i)(B).

71.    Defendants do not maintain and record a list of telephone numbers that their Agents may not contact pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(C).

72.    Defendants do not use any process to prevent telephone solicitations of any number on the NDNCR and do not maintain records documenting their process pursuant to 47 U.S.C. § 64.1200(c)(2)(i)(D), or to the extent they attempt to use such processes, they remain out of compliance with NDNCR regulations.

**C. Defendants Have Abused the Corporate Form, and Piercing the Corporate veil Is in The Interest of Justice**

73.    Defendants utilize a complicated web of divisions, subsidiaries, franchises, and shell companies and rely heavily on the Real Broker brand and the Real Broker Agents to conduct business. They operate as alter-egos of each other and their related subsidiaries, divisions, franchises, and shell companies, and together these entities

authorize and ratify the work, including the cold call strategies, of the Real Broker Agents performed on their behalf for their profits.

74.    Defendants' public materials provide little information to be able to discern how exactly they are structured. But what is known suggests that they abuse the corporate form, and unless the corporate veil is pierced, Defendants might successfully avoid accountability for their TCPA violations through their use of shell companies, confusing nomenclature, and/or the attempted classification of their affiliated agents, the Real Broker Agents, as "independent contractors."

75.    Defendants' confusing structure appears to be, at least in part, intentionally designed to confuse and obfuscate and thereby limit liability and exposure. It makes it impossible or near impossible for a victim of a tort committed under the Real Broker brand name to identify the responsible party. It directs those victims only to small subsidiaries that appear to be undercapitalized, as they share offices with the Real Broker Parent, suggesting they are not capitalized in such a way so as to permit them to maintain their own offices, and that the corporate form is abused as they do not appear to have any true independence from the Real Broker Parent. Defendants then have those subsidiaries either directly retain "independent contractors," or alternatively, create even more subsidiaries underneath them, which in turn retain those "independent contractors." Those "independent contractors," i.e, the Real Broker Agents, then commit tens of thousands of torts when they engage in autodialing and harassing calls in violation of the TCPA on the behalf of Defendants. And Defendants have created this confusing corporate structure while knowing that neither the individual Agents making the calls on their behalf, nor the subsidiaries and shells with which those Agents contract, have the capital to reimburse victims of those TCPA violations. Thus, by structuring their enterprise in this way, Defendants have created a structure which permits them to profit from the legal violations for which they maintain they should not be held responsible.

76.     Defendants' confusing corporate structure and use of multiple entities suggests they abuse the corporate form and work as alter-egos of each other. Additional information about Defendants' corporate structure and each entity's precise role in the false advertising and misconduct described herein is not within Plaintiff's knowledge, possession, custody, or control, and it is impossible to discern what is an accurate depiction of Defendants' corporate structure absent discovery.

**D. Plaintiff Kyle Miholich's Experience**

77.     Plaintiff Kyle Miholich registered his cell phone number ending in 5823 on the National Do Not Call Registry on October 27, 2006.

78.     Mr. Miholich uses his cell phone number for personal use only - and did so at the time he was sent text messages by Nicolle Romero, a Real Broker Agent working under the Real Broker brand. Despite this fact, Mr. Miholich was texted multiple times by this agent to see if he was interested in engaging her services as a listing agent.

79.     Mr. Miholich received an unwanted telemarketing text message from Ms. Romero from (619) 270-2269 on February 14, 2024, which read:

> "Hey there, my name is Nicolle, I'm a local realtor here in SD. Sorry for the random text, but theres been a high amount of buyer interest in your neighborhood so I'm reaching out to ask if you'd be interested in me emailing you a free home valuation report? Just on the off chance you've been considering selling your home this year.  Let me know!"

80.     Mr. Miholich received a second unwanted telemarketing text message from Ms. Romero from the same phone number on April 20, 2024, which read:

> "Hey there – it's Nicolle again with Key Realty, I wanted to reach out to see if you were interested in receiving a free valuation report of your home?  San Diego had the highest appreciation rate in the country this past year!"

81.     Mr. Miholich received a third unwanted telemarketing text message from Ms. Romero from the same phone number on June 11, 2024, which read:

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

> "Hi there, it's Nicolle again with REAL Brokerage. Did you know that San Diego home prices increased by 8.8% last year? Thats the highest appreciation rate in the country! If you're curious about what your home might be worth, I'm happy to provide a free estimate. No obligation, just useful info. Let me know!

82.    Ms. Romero worked as an agent for Defendants at the time she sent the text messages to Mr. Miholich on behalf of Defendants.

83.    Such text messages constitute telephone solicitations pursuant to 47 C.F.R. § 64.1200(c), as they were an attempt to promote or sell Defendants' services. Specifically, both text messages were sent on behalf of Defendants and were intended to solicit and secure the sales listing for Mr. Miholich's home.

84.    The text messages were impersonal and did not reference Mr. Miholich by name, suggesting the text messages were sent *en masse* via a text autodialer platform from a stored list of phone numbers.

85.    The first text message admitted that the text was "random" indicating it was sent *en masse*.

86.    Mr. Miholich never gave Defendants nor any Real Broker Agent, including Ms. Romero, consent to call or text him.

87.    Mr. Miholich did not have an established business relationship with either Ms. Romero or Defendants during the time of the telephone solicitations.

88.    The originating telephone number of the above text messages, (619) 270-2269, is the same number that is listed as Ms. Romero's contact number on her business website. [7]

89.    "Key Realty" appears to be an alter-ego of either Ms. Romero or Defendants, and does not appear to be a registered business entity within the State of California. Ms. Romero's website lists "Real Brokerage Inc." in its contact

---

[7] https://nicolleromero.keyrealtyca.com (last accessed June 10, 2024)

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

information, identifies "Real Brokerage Inc." as the owner of the website in its Terms of Service, and also lists a business address of 1420 Kettner Blvd, San Diego, CA 92101 – the same office address as Defendant Real Brokerage Technologies Inc.[8]

90.    Ms. Romero is also listed as a Real Broker Agent within Defendants' own website, wherein she has a dedicated webpage with her contact information and lists of affiliated real estate property listings.[9]

## **ARTICLE III STANDING**

91.    Defendant sent multiple text message to Plaintiff's personal cellular telephone which was registered on the National Do-Not-Call Registry. Such unwanted text messages from Defendant are a nuisance, an invasion of privacy, and wasted Plaintiff's time and enjoyment in use of his personal cellular telephone. All three of these injuries are concrete and *de facto*.

92.    Furthermore, Plaintiff was distracted, inconvenienced, and annoyed by having to take time to open and read each text message.

93.    All of these injuries are particularized and specific to Plaintiff, and will be the same or substantially similar injuries suffered by each member of the putative class.

94.    The above text messages were linked to Defendants as they were sent on behalf of both Defendants and their employed Agent Ms. Romero, who are the parties that attempted to solicit business from Plaintiff for their financial benefit.  These text messages are the sole source of Plaintiff's and the Class's injuries. Therefore, Plaintiff has illustrated facts that show that his injuries are traceable to the conduct of Defendants.

---

[8] https://nicolleromero.keyrealtyca.com (last accessed June 10, 2024)

[9] https://onereal.com/profile/nicolle-romero?backUrl=%2Fsearch-agent%3Fsearch_label%3Dnicolle%26search_by%3DAGENT (last accessed June 10, 2024)

95. Plaintiff's Request for Relief includes a request for damages for each text message made by Defendants and telephone calls to cellular numbers on the National Do-Not-Call Registry, as authorized by statute in 47 U.S.C. § 227, *et seq*. The statutory damages were set by Congress and specifically redress the damages suffered by Plaintiff and the members of the putative class.

## **CLASS ACTION ALLEGATIONS**

96. Plaintiff brings this action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of the following class, of which Plaintiff is a member, which is defined as follows:

> **National Do-Not-Call Nationwide Class**:
> All persons within the United States (1) registered on the National Do-Not-Call Registry for at least 30 days, (2) who received more than one call or text message (3) made or sent by or on behalf of Defendants, (4) for the purpose of promoting Defendants' goods or services, (5) within any twelve-month period, (6) within the four years prior to the filing of the Complaint.

97. Excluded from the Class are Defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

98. Plaintiff reserves the right to redefine the class and to add subclasses as appropriate based on discovery and specific theories of liability.

99. Plaintiff and members of the Class were harmed by the acts of Defendants in at least the following ways: Defendants, either directly or through its agents, illegally contacted Plaintiff and the Class members via their telephones, whether cellular telephones or otherwise, for solicitation purposes, thereby invading the privacy of said Plaintiff and the Class members whose cellular telephone numbers were on the National Do-Not-Call Registry. Plaintiff and the Class members were damaged thereby.

100.   <u>Numerosity</u>: Upon information and belief, the members of the classes are so numerous that joinder of all of them is impracticable.

101.   The exact number of the members of the classes is unknown to Plaintiff at this time, and can (and will) be determined through appropriate discovery. However, given that, on information and belief, Defendants texted and called thousands of class members nationwide during the class period, it is reasonable to presume that the members of the Class are so numerous that joinder of all members is impracticable. The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.

102.   <u>Ascertainability</u>: The members of the class are ascertainable because the class is defined by reference to objective criteria.

103.   In addition, the members of the class are identifiable in that, upon information and belief, their cellular telephone numbers, names and addresses can be identified in business records maintained by Defendants and by third parties.

104.   <u>Typicality</u>: As a person who received numerous telephone solicitations from Defendants within a 12-month period, who did not have an established business relationship or personal relationship with Defendants, and who did not provide Defendants prior express invitation or permission to receive telephone solicitations, Plaintiff is asserting claims that are typical of the Class.  Plaintiff will fairly and adequately represent and protect the interests of the Class in that Plaintiff has no interests antagonistic to any member of the Class.

105.   Plaintiff's claims are typical of the claims of the members of the class. Plaintiff has had to suffer the burden of receiving unwanted text messages to his cellular telephone, despite his phone number having been registered on the National Do-Not Call Registry.  Thus, his injuries are typical to Class Members.

106.   Plaintiff's claims, and the claims of the members of the class, originate from the same conduct, practice and procedures on the part of Defendants.

107.   Plaintiff's claims are based on the same theories, as are the claims of the

members of the class.

108.    Adequacy: Plaintiff is qualified to, and will fairly and adequately protect the interests of the members of the class with whom he is similarly situated, as demonstrated herein. Plaintiff acknowledges that he has an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member.

109.    Plaintiff's interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the class.

110.    Plaintiff will vigorously pursue the claims of the members of the class.

111.    Plaintiff has retained counsel experienced and competent in class action litigation. Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. In addition, the proposed class counsel is experienced in handling claims involving consumer actions and violations of the TCPA.

112.    Plaintiff's counsel will vigorously pursue this matter.

113.    Plaintiff's counsel will assert, protect and otherwise represent the members of the class.

114.    Plaintiff has incurred, and throughout the duration of this action, will continue to incur costs and attorneys' fees that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each Class Member.

115.    Predominance: The questions of law and fact common to the members of the class predominate over questions that may affect individual members of the class. The elements of the legal claims brought by Plaintiff and Class Members are capable of proof at trial through evidence that is common to the Class rather than individual to its members.

116.    Commonality: There are common questions of law and fact as to all members of the Class, including but not limited to the following:

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

a.  What is Defendants' conduct, pattern, and practice as it pertains to delivering advertisement and telemarketing text messages and phone calls;

b.  Whether, within the four years prior to the filing of this Complaint, Defendant or its agents sent more than one text message or phone call to the members of the Class whose telephone numbers were on the National Do-Not-Call Registry and who had neither an established business relationship nor personal relationship with Defendant;

c.  Whether Defendant obtained prior express written consent to send the text messages or calls to Plaintiff or the Class members' telephones;

d.  Whether Defendants' calls or texts were made for an emergency purpose;

e.  Whether Defendants have established written procedures to comply with National Do Not Call Registry registrations;

f.  Whether Defendants train personnel on any procedures to comply with National Do Not Call Registry regulations;

g.  Whether Defendants use any process to prevent telephone solicitations of any number on the National Do Not Call Registry and maintaining records documenting the process;

h.  Whether Defendant's conduct violated the TCPA, and availability of statutory penalties;

i.  Whether Defendants maintain and record a list of telephone numbers that they may not contact;

j.  Whether Plaintiff and the Class members were damaged thereby, and the extent of damages for such violation; and

k.  Whether Defendant should be enjoined from engaging in such conduct in the future.

117. <u>Superiority</u>: A class action is superior to all other available methods for

the fair and efficient adjudication of this matter because:

- If brought and prosecuted individually, the claims of the members of the class would require proof of the same material and substantive facts.

- The pursuit of separate actions by individual members of the class would, as a practical matter, be dispositive of the interests of other members of the class, and could substantially impair or impede their ability to protect their interests.

- The pursuit of separate actions by individual members of the class could create a risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendants.

- These varying adjudications and incompatible standards of conduct, in connection with presentation of the same essential facts, proof, and legal theories, could also create and allow the existence of inconsistent and incompatible rights within the class.

- The damages suffered by each individual member of the class may be relatively modest, thus, the expense and burden to litigate each of their claims individually make it difficult for the members of the class to redress the wrongs done to them.

- Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

- The pursuit of Plaintiff's claims, and the claims of the members of the class, in one forum will achieve efficiency and promote judicial economy.

- There will be little difficulty in the management of this action as a class action.

118.    Defendants have acted or refused to act on grounds generally applicable to the members of the class, making final declaratory or injunctive relief appropriate.

119.   Plaintiff and the members of the Class have all suffered irreparable harm as a result of the Defendants' unlawful and wrongful conduct.  Absent a class action, the Class will continue to face the potential for irreparable harm.  In addition, these violations of law will be allowed to proceed without remedy and Defendants will likely continue such illegal conduct.  Because of the size of the individual Class member's claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein.

120.   A class action is a superior method for the fair and efficient adjudication of this controversy.  Class-wide damages are essential to induce Defendants to comply with federal law.  The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small because the maximum statutory damages in an individual action for violation of privacy are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

121.   Plaintiff and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful conduct.

122.   This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of Class Members and it expressly is not intended to request any recovery for personal injury and claims related thereto.

## COUNT I

### VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT

### REGARDING THE NATIONAL DO-NOT CALL REGISTRY

### 47 U.S.C. § 227(C) AND 47 C.F.R. § 64.1200(C)

123.   Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

124.   Plaintiff and members of the National DNC Class received more than one marketing text message or phone call within a 12-month period, sent by or on behalf of Defendants, for the express purpose of marketing Defendants' goods and/or

1   services without their written prior express consent.

2       125.   At all relevant times, Defendants knew or should have known that their

3   conduct as alleged herein violated the TCPA.

4       126.   Defendants sent at least two unsolicited and unauthorized text messages

5   and/or phone calls to the cellular telephones of Plaintiff and the Class members,

6   cellular telephones which were registered with the National Do-Not Call Registry, for

7   the purpose of marketing goods and/or services to Plaintiff and the Class.

8       127.   Defendants knew that it did not have prior express written consent to

9   send these text messages and/or phone calls, and knew or should have known that it

10  was sending text messages or making calls to cellular numbers on the National Do-

11  Not Call Registry in violation of the TCPA.

12      128.   Defendants willfully or knowingly allowed text messages and/or phone

13  calls to be sent to Plaintiff's and Class members' cellular telephone numbers on the

14  National Do-Not Call Registry. For instance, Defendants could have determined from

15  a review of its own business records and the National Do-Not Call Registry that it

16  could not contact Plaintiff and/or Class members, yet disregarded such information

17  and placed illegal and unwanted solicitation text messages and calls.

18      129.   Defendant's text messages and/or calls caused Plaintiff and members of

19  the National DNC Class actual harms including, but not limited to, invasion of their

20  personal privacy, aggravation, inconvenience, nuisance and disruption in their daily

21  lives, reduction in cellular telephone battery life, data, and loss of use of their cellular

22  telephones.

23      130.   Because Defendants knew or should have known that Plaintiff's and

24  Class Members' cellular telephone numbers were on the National Do-Not Call

25  Registry, the Court should treble the amount of statutory damages available to

26  Plaintiff and the other members of the putative Class pursuant to § 227(b)(3) of the

27  TCPA.

28      131.   As a result of Defendants' violations, Plaintiff and the Class Members

KAZEROUNI
LAW GROUP, APC

are entitled to an award of $1,500.00 in statutory damages, for each and every willful or knowing violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C) or in the alternative an award of $500.00 in statutory damages, for each and every negligent violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

132.   Plaintiff and the Class are also entitled to and seek injunctive relief, pursuant to 47 U.S.C. § 227(c)(5)(A), prohibiting such conduct in the future. Plaintiff also seeks an award of attorneys' fees and costs on behalf of Plaintiff and the Class.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, respectfully requests the following relief:

- An order certifying this matter as a class action with Plaintiff as Class Representative, and designating Plaintiff's counsel as Class Counsel.
- Injunctive relief prohibiting Defendants from engaging in such conduct in the future pursuant to 47 U.S.C. § 227(b)(3)(A);
- Statutory damages of $500.00 for Plaintiff and each member the Class for each and every one of Defendants' negligent violations of 47 U.S.C. §§ 227, *et seq*. pursuant to 47 U.S.C. § 227(b)(3)(B);
- Statutory damages of $1,500.00 for Plaintiff and each member the Class for each and every one of Defendants' knowing or willful violations of 47 U.S.C. §§ 227, *et seq*. pursuant to 47 U.S.C. § 227(b)(3)(B);
- Statutory damages of up to $500.00 for Plaintiff and each member the Class for each and every one of Defendants' negligent violations of 47 U.S.C. §§ 227, *et seq*. pursuant to 47 U.S.C. § 227(b)(3)(C);
- Statutory damages of up to $1,500.00 for Plaintiff and each member the Class for each and every one of Defendant's willful or knowing violations of 47 U.S.C. §§ 227, *et seq*. pursuant to 47 U.S.C. § 227(b)(3)(C);
- Costs of suit;

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

- An award of attorneys' fees, pursuant to, *inter alia*, the common fund doctrine;

- Pre-judgment and post-judgment interest on monetary relief; and

- All other and further relief as the Court deems necessary, just, and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the Class, demands a jury trial on all issues so triable.

Dated: June 14, 2024                    Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: /s/Ryan L. McBride
Ryan L. McBride, Esq.
ryan@kazlg.com
*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF